Johnston, Ch.,
delivered the opinion of the Court.
Little need be added to what the Chancellor has said, in his decree, in relation to the construction of the (so called) residuary clause of Charles E. Rowand’s will.
This testator was entitled, under his father’s will, to the annual interest, for life, of one-tenth part of a certain portion of the father’s estate, which, under the directions of the will, was sold, and the proceeds vested for his benefit. And besides what arrearages of this provision might be due him, at his death, there was nothing coming to him from his father’s estate. So that *294 this money, and what little might be, accidentally, due to him from other quarters, was all the money he had to dispose of. ■
Accordingly we find that the specific sums, disposed of by him in his will, amounted, in the whole, to only the sum of $300: and even these small legacies were given with expressions of distrust whether there would be money enough to satisfy them.
In his 'will, after disposing specifically of some few articles of insignificant value: he proceeds as follows :
“ I leave Rev’d. Arthur Buist the sum of $200, should there he a sufficiency, after some or all my debts are paid.
“ Should there, also, be a sufficiency, I leave to the Ladies Benevolent Society the sum of $50, to be paid them by my executor.
“ I leave to my nephew, O. E. Rowand Drayton, $50; and all the rest of monies coming to me from the estate of ,my father, or from any other quarter, I give and bequeath to my brother Robert Rowand’s family, for their use and support.”
The word monies, must be understood here in its ordinary meaning, , of cash, coin, bank notes, or other circulating medium, unless there is something in the context of the will, or in the existing circumstances, to shew that it was employed in a different sense. .
In looking to the extrinsic circumstances, we should not be justified in applying the word used by the testator to any thing but money, unless in that survey we discovered that there was no money, to come to the testator from his father’s estate, but that something else was coming from that estate to which the term money might be applied, in a secondary, or less obvious sense.
But, when we discover that money was coming to him, and nothing else, we are obliged to say that the reference of the testator, was to money, and to nothing else.
Neither does the context of the will lead to any other conclusion.
The clauses immediately preceding the clause in question *295 relate to money: or bequests of money: — and it is obviously of importance, that from these, he proceeds immediately to dispose of the rest of the monies due him. (a) The word rest here undoubtedly refers to the rest of that subject, which he was engaged in disposing of at the time. The interpretation of the word (rest) by the connection in which it is used, is a rule of interpretation familiar to the profession: and so far has it been carried that, in some instances, where the residuary words were descriptive not only of the subjects embraced in the prior clauses, but had a general meaning taking in other species of property, they have been restricted, by the connexion, to property of a like description with that previously disposed of. Thus, where the residuary words would, in themselves, have extended to realty, as well as personalty, they have been so restricted as to indicate only the rest of personalty, because the prior dispositions were of personalty onIy.(b)
This doctrine has, undoubtedly, been stretched beyond the limits of good sense in some of the cases. But it is founded in good sense, and is conformable to the usages of mankind : and it is presumed that no man, speaking in the ordinary way of the distribution of certain portions of money, thus and thus, and the rest so and so, would ever be understood as meaning by this rest any thing else than the rest of that of which he had been, speaking; i. e. the rest of his money. How much stronger the evidence of his meaning, when, as in this case, he expressly characterises the residue as money!
This Court, therefore, concurs in that part of the decree which relates to this subject; and it is ordered that the same be affirmed, and the appeal dismissed.
Another part of the decree is, in our view, more doubtful. It is that part of it which establishes a right of election between the dower awarded to the widow of James D. Sommers, in her life time, and a distributive part of his estate, which is now claimed in its place.
*296 By the will of Edward Tonge, who died in 1-809, his estate, real and personal, was given to his wife, during widowhood;— remainder, for life, to his mother; — remainder, for life, to James B. Perry; — remainder to such of his issue as should survive him: — in default of such issue, to John W. Sommers, with like limitations ; — and in default of issue surviving Mm, — then over, in fee, to James D. Sommers.
The widow of Tonge forfeited her estate by marriage. The mother took possession and enjoyed the property until her death; upon which it devolved on J. B. Perry.
While he was yet alive, James D. Sommers died, (about 1819,) leaving a wife, — who, in the latter part of that year, intermarried with McDow.
Then, in 1821, or 1822, James B. Perry died without issue.
Thereupon, John W. Sommers took possession and enjoyed the property until 1848 ; when he died without issue.
It was held by Chancellor Dargan that the personal property covered by the will of Tonge, passed over, upon the death of John W. Sommers, to the estate of James D. Sommers; and he having died intestate, was distributable among his distributees, of whom his wife, (afterwards Mrs. McDow,) was one.
But, as far back as 1820, it appears that she and her second husband, McDow, brought suit against the other distributees of James D. Sommers, and recovered about $400, as a commutation for her dower in James D. Sommers’s real estate called Golden Grove ; the execution for which was levied on Golden Grove; and that tract, (which was all that existed or remained of James D. Sommers’s real estate, at the time) was sold and conveyed by the sheriff to McDow, at a sum approximating, but somewhat less than the dower assessed. _ This sale and conveyance took place in December, 1820.
Mrs. McDow lived until somewhere about 1831, and Mr. Mc-Dow somewhat longer: but no movement was made by them, or either of them, or the heirs or representatives of either, towards claiming any further interests in James D. Sommers’s es *297 tate until after John W. Sommers’s death; which took place, as has been stated, in 1848.
When Chancellor Dargan delivered his decree, of which I have spoken, (adjudging distribution,) the fact of this allotment or assignment of dower did not appear in the pleadings, and was not brought to his view. After the decree was pronounced, but before it came before the Appeal Court, this feet was suggested on the record, by way of amendment to the bill: and the parties proceeded to argue, and did argue, the question in the Appeal Court, (Jan. 1850,) whether the allowance of dower was a bar to the thirds* claimed for Mrs. McDow, or whether an election between the dower and the thirds should still be allowed. As that question had not been heard on the circuit, the Court could not determine it in appeal; and, therefore, remanded the cause to the circuit, that it might be heard and determined there ; thus opening the circuit decree upon that point.
In the decree now under review, Chancellor Dunkin has entitled the heirs and representatives of Mrs. McDow, and of Mr. McDow, (one of the distributees,) to claim the thirds, in her right, out of the estate which fell in upon John W. Sommers’s death, provided they repay the sum received in 1820, in lieu of her dower, with interest.
And this is an appeal, by all parties, from his decision.
It may be proper, before proceeding to the questions made by the grounds of appeal, to dispose of a point which was obscurely intimated after the argument was closed.
It is that the parties claiming Mrs. McDow’s thirds are entitled to the benefit of Chancellor Dargan’s decree; that it is to be regarded as still subsisting and unopened, unless the other side shew grounds of equity for setting it aside.
I can only say that the amendment of the record was made by consent, to come up with Chancellor Dargan’s decree, as if the decree had been made upon the record as amended; and the parties must take the consequences.
*298 It was made with the express view of submitting the question to the Appeal Court, whether the assessment and assignment of dower were not a bar, in this Court to the claim of thirds, and whether, under the circumstances, the parties making the claim might not retract, and make an election now,
It was so argued, in Appeal, in 1850; and the order remanding the cause was made with a view to the discussion and decision of that question.
It was so argued here, on this appeal; and never, until after the case was closed was any intimation given to the contrary. Indeed, I hardly understand, now, whether the point is intended to he made.
But if it is, there is nothing in it.
There is no doubt whatever that the acceptance of dower, whether intended as a waiver of thirds, or not, is a bar, at law, and in equity, to the claim of thirds. It is made so by the necessary construction of the statute of 1791; a construction which has been adopted in many cases.
Can it be doubted, then, that, when the fact is proved that dower has been accepted, the party accepting it is not equitably entitled to retain a decree for its equivalent ? I do not mean when this proof is made collaterally, in a different suit, as in McDowall vs. McDowall ;(c) but when, as in this case, it is made in the same cause, and made by consent with the express view of testing the correctness of a part of the decree in the case.
Can any one affirm, that if Mrs. McDow’s acceptance was intended to have been in lieu of thirds, she could equitably insist on the decree obtained for the thirds, while the case is still pending, and the question open, by consent, and before the Court 1
It is impossible. The dower being accepted, is, — so long as the dowress is not allowed to retract, — a complete bar: — and, therefore, a decree for thirds is inequitable and should not be allowed to stand, when the Court retains a control over the sub *299 ject. But the truth is the decree referred to in this case was virtually opened by this Court in 1850.
The case was presented and argued in appeal, in 1850, as if the amendment had been in before Chancellor Dargan’s decree, and interposed by way of objection to his making the decree he did : — as if he had overruled the objection. This was the light in which this Court viewed the objection : and it sent the case back, only because he had not, in fact, heard and overruled it. How, then, can it be said that the case was sent back subject to the decree: when plainly it was sent back to ascertain whether such a decree should ever have been made ?
If I am right in this, then, upon the merits the only equity of the parties in possession of the dower, must consist in a right to retract and elect, if such right can be shewn.
This was the view taken by the Chancellor, as appears by the whole tenor of his decree. It is the correct view; and, if the claimants are not entitled to the election he has given them, they must abide by the dower as assessed and accepted.
It has been attempted to be shewn in the argument, that the proceedings at law, by which the dower was allotted, are null and void, in consequence of defects in the record; and that, therefore, the amount received under the recovery is no satisfaction of the right of dower; and consequently dower has not been received or accepted.
If the record were void, it would by no means follow that the sum of money recovered as a compensation for dower, though received under it, was no satisfaction of the dower, and equivalent to a reception of the dower, itself. But the defects pointed out do not vitiate the judgment. We are not to look behind the judgment for the purpose of ascertaining whether Mrs. Me-Dow was or was not before the Court, in virtue of a power of attorney executed by her as authorised by the statute. It was the business of the Court, before which the cause was heard, to see that the parties were before it, and after it has given judgment, we are bound to presume that it had proper evidence of the fact, before it took jurisdiction. Miserable would be the *300 condition of the community, if a doctrine should receive the least countenance, by which solemn judgments would be converted into absolute nullities, merely because the writ, or the warrant of attorney, which led to them, may have been mislaid or may have perished from lapse of time.
Neither can the form of the judgment vitiate it. The Court had jurisdiction of the subject matter, and must determine for itself, (for it was a part of its judicial functions in the case,) what judgment was proper to he given between the parties before it.
These principles are too well settled to require further consideration.
Then, the important question, which was considered in the decree, occurs: — whether Mrs. McDow’s acceptance of the dower precluded the claim for thirds now set up; and whether, a retraction will be allowed, and a right of election given.
Wherever two rights are alternatively created, or given, either in express terms or by construction, the party to whom they are given is entitled to only one of the two, and must elect between them: hut after he has made his election, he is bound; and will not be allowed to elect, again, unless he can shew some equitable circumstances entitling him to retract the choice he has made.
There is some difference, in this matter of election, owing to the quality of the rights, among which, the election is to be made : — i. e. whether they are legal or equitable.
If the alternative rights are legal, that is to say, if both of them purport to vest a legal title in the party to whom they are given: — though a court of law could not compel an election, while the matter may have remained executory, yet after an election has been made (and it is sufficient, to constitute such an election at law, that one has been taken, — though it was not taken as an alternative, or by way of choice between the two): — it operates as a complete legal bar, by way of estoppel, against the claim of the alternative. The title to that, though it was before a complete legal title, is extinguished.
Thus, under the statute of uses, uses which would have been *301 executed in the husband to the extent of creating a title to dower in the wife, are prevented from being executed to that extent, by the proviso that the dower shall not be claimed if a jointure was settled on her. (d) In such case the acceptance of the jointure is a bar of the dower, and vice versa. The acceptance of the one is a satisfaction of the other, and the legal right or title to that other is extinguished.
So here: the right to dower, or thirds, is made convertible by the statute of 1791: and both being legal rights proceeding to the wife, if she takes one, her legal right to the other perishes.
It is unnecessary, therefore, to go into an examination of the argument, at bar, in relation to rights of an equitable character, or in relation to elections expressly created by the instrument, or implied by equity in promotion of the evident intention; or in relation to the different degrees of evidence required to prove that an election has been made in the one case or the other.
I take it that whenever an election has been made, either at law or in equity, it is a satisfaction of the alternative right: and that the party will not be allowed to retract, unless upon grounds of equity, shewn to exist, by evidence inherent in the circumstances, or extrinsic.
I will assume that equity has a right to put out of the way the legal consequences of Mrs. McDow’s acceptance of dower: the question is whether she herself, if now alive, would be allowed, under the circumstances of this case, to retract what she has done, and to elect between her dower and thirds.
This is not a case where an election remains to be made. The right is not executory, but executed.
It is not a case, even, where dower was taken, irrespective of the alternative right. It is not a case of mere estoppel, but a positive election, intentionally made. Clarke’s testimony shews that the attention of the parties was drawn to the alternative of choosing between dower and thirds in James D. Sommers’s *302 estate : and that the former was chosen under his advice, as the more valuable of the two.
It is true that the value of the expectancies dependant upon the deaths of James B. Perry and John W. Sommers and then-issue may not have been estimated on that occasion. But it is probable that the circumstances upon which that contingent right depended were known; because Clarke speaks of opinions as “ set down opinions, in the family” which could only have sprung from a knowledge of the provisions of Tonge’s will.
But a choice made. upon a view of interests as contingent, and which were in fact contingent at the time of the choice, is a deliberate choice, — a well understood act, — a fair exercise of the judgment: — and a subsequent result of the contingency, which, if foreseen, would have led to a different choice, — forms no ground for another election.
It may be affirmed, without hesitation, that Mrs. McDow was right in the choice she made, supposing that she took a deliberate view of the expectancy, and the contingencies upon which it was to depend. Her election was made in 1820; at which time two life estates, of young men, interposed before her husband’s expectancy: and not only so, but the expectancy was liable to be entirely defeated by either of those two leaving issue.
Such an expectancy could have had no marketable value at the time she was called upon to elect between it and her dowé'r: and if she had chosen to abide by the expectancy, she could not have sold it and must have starved herself to enrich her heirs. Would that have been the exercise of a sound election on her part 1 If the Court were to grant her if now living, a second choice, it must be upon the principle that her first choice was,— at the time it was made, — improvident and mistaken: and I repeat the question : — Was it unwise, improvident, or mistaken ?
But, if a right of election can be revived, the claim must be made within reasonable time. Here thirty years have expired; during all which time there was a perfect acquiescence. Lord Hardwicke observes in Pawlet vs. Delaval, (e) that “facts *303 and acquiescence are material to determine great rights and properties ; and many decrees have been made thereupon in this - Court: ”and we see how far our own Courts have gone upon this subject in the cases of Wilson vs. Hayne, (Chev. Eq. 37) and Caston vs. Caston, (2 Rich. Eq. 1) where elections were held to be conclusive upon a much shorter lapse of time.
Suppose, however, that Mrs. McDow could insist upon a retraction of her acts; — can her heirs and representatives claim the same rights 1
As a general rule privies in the post are bound by all the acts and engagements of those under whom they claim ; and if the latter rested satisfied with their transactions, and died without seeking to unravel them, their privies are concluded.
In Stratford vs. Powell, (f) Lord Ch. Manners said: “The utmost I could have done if I had any doubt upon this part of the case,” (a question of election, the electing party being dead after having elected) “ would have been to refer it to the master, to ascertain what was most for her advantage: — though I never heard of that being done after the death of the wife, or of the party bound to elect: Here the act and acquiescence of Lady Aldborough are sufficient to bind her and those deriving from her.”
In Archer vs. Pope, (g) Lord Hardwicke expressed the opinion that “if a freeman of London make a will contrary to the custom, and dies, though the wife is not perhaps executrix ; nor does so strong an act as is done here, by her proving the will, but has acted in this manner, without declaring one way or the other ; the Court will not suffer the representative of the wife to insist on the custom, in contradiction to what was done by herand that in cases where, if the wife had been before the Court, she might have had an election; therefore, if she has done it, for a short time only, that acquiescence shall hind her and her representatives: — and it would be very mischievous if the Court should suffer her representatives to take it up in prejudice of the children.”
*304 He expressed the same opinion in a number of the reported cases: so that it was well considered and settled in his mind.
Upon what principle can it be maintained in this case, that the privies of Mrs. McDow are entitled to be let in to elect, unless it be that her election when made was unwise and to her disadvantage?’ We have seen that it was not so. The privies come in here to elect, upon a contemplation of their own interests, as they now stand, and not upon a contemplation of her interests as they stood at the time she made her election. But it is her election, and not that of her representatives, which is sought to be set aside: and the true question is whether the election made by her, with whom the right of election was, was beneficial and satisfactory to her, whether it be otherwise to her representatives or not.
Being upon the whole, of opinion that no new election should have been allowed we are, of course, of opinion that the compensation which was given as a condition of allowing it, should not have been decreed. Indeed the parties to whom the compensation should have been made, were the creditors of James D. Sommers and not his heirs.
It is ordered that so much of Chancellor Dunkin’s decree as gives a right to elect thirds, and decrees compensation for the dower; and also (out of caution) that so much of Chancellor Dargan’s decree as allowed Mrs. McDow, her representatives and distributees, to come in for. a distributive share of James D. Sommers’s estate, be reversed.
Dargan and Wardlaw, CC. concurred.

Decree reversed.

 Haynsworth vs. Cox, Harp. Eq. 121.

 Marchant vs. Twisden, Grilb. Eq. Ca. 30.

 Note by his Honor. I have use,d the -word, “i/árds,” throughout this opinion to obviate circumlocution, and designate Mrs. McDow’s distributive share: which was, in fact, one-half, and not one-third.

 Bail. Eq.. 334.

 d) See Gretton vs. Harvard, 1 Swan. 425, note (a): cited 2 Story Eq. §1080, (5th Ed.)

 2 Ves. sen. 668.

 Ball & B. 24.

 2 Ves. sen. 525.